**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **STEVEN T. BLACKMAN,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  3:16-CV-0358-M-BH** |
| | § | |
| **NANCY A. BERRYHILL, ACTING,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge** |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Pursuant to *Special Order No. 3-251*, this case was automatically referred for issuance of findings, conclusions, and recommendation.  Before the Court is *Claimant Steven T. Blackman's Brief in Support of His Claim for Disability Benefits*, filed May 29, 2016 (doc. 17); *Defendant's Brief*, filed June 21, 2016 (doc. 18); and *Claimant Steven T. Blackman's Reply in Support of His Claim for Disability Benefits*, filed July 11, 2016 (doc. 19).   Based on the relevant findings, evidence, and applicable law, the Commissioner's decision should be **REVERSED**, and the case should be **REMANDED** for further administrative proceedings.

## I.   BACKGROUND[1]

### A.   Procedural History

Steven T. Blackman (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner)[2] denying his application for disability insurance benefits (DIB) under Title II of the Social Security Act (Act).   (doc. 17 at 11.)  On August 18, 2009, he applied for

---

[1]  The background information comes from the transcript of the administrative proceedings, which is designated as "R."

[2]  At the time of the initial filing of this appeal, Carolyn W. Colvin was the Acting Commissioner of the Social Security Administration, but she was succeeded by Nancy A. Berryhill beginning January 20, 2017.

DIB, alleging disability beginning May 1, 2008.  (R. at 428-434.)  His claim was initially denied on

December 16, 2009, and upon reconsideration on November 12, 2010.  (R. at 159, 173, 196, 200.)

On July 6, 2011, he requested a hearing before an administrative law judge (ALJ).  (R. at 206-07.)

He appeared without representation at a hearing on December 23, 2011, but the ALJ reset the

hearing because Plaintiff had brought a large amount of new medical documents.  (R. at 131-58.)

He appeared and testified without representation at a hearing on January 20, 2012.  (R. at 95-130.)

The ALJ denied Plaintiff's applications on March 27, 2012, finding him not disabled.  (R. at 174-

88.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council, and it granted review

of the ALJ's decision.  (*See* R. at 374.)  On February 8, 2013, the Appeals Council vacated the

decision of the ALJ and remanded the case.  (R. at 189-92.)

On February 26, 2014, Plaintiff appeared with an attorney and testified at a hearing before

the ALJ.  (R. at 43-94.)  The ALJ again denied Plaintiff's application on June 23, 2014, finding him

not disabled.  (R. at 16-42.)  Plaintiff timely appealed the ALJ's decision to the Appeals Council,

and the Appeals Council adopted the ALJ's decision on December 14, 2015.  (R. at 1-7, 15.)

Plaintiff timely appealed the Appeals Council's decision under 42 U.S.C. § 405(g).

## B.   Factual History

### 1.   Age, Education, and Work Experience

Plaintiff was 36 years old at the time of the hearing on February 26, 2014.  (R. at 26.)  He

graduated from high school and had some college.  (*Id.*)  Plaintiff previously worked as a mill

wright, security guard, cavalry scout, and cashier.  (R. at 32.)

## 2.      Medical, Psychological, and Psychiatric Evidence

On May 10, 2008, while on active duty in the army, Plaintiff fell from the back of a stationary vehicle and hit his head and back.  (R. at 2902, 2904.)  He was transported to an emergency room, where he reported neck and back pain and nausea.  (R. at 2904.)  On May 19, 2008, Plaintiff had an MRI, which appeared normal.  (R. at 773.)

Plaintiff was evaluated by Clark L. Jennings, M.D., on May 28, 2008, for purposes of obtaining ADHD medication.  (R. at 758.) Dr. Jennings noted attention problems, limited short-term memory, chronic self-esteem issues, chronic dysthymic, social anxiety with some obsessiveness, and traumatic experiences during his repeated deployments.  (*Id.*)

On August 13, 2008, Plaintiff met with Kimberly Duncan, CCC-SLP, after being referred by Ann Craig, M.D.  (R. at 773.) Ms. Duncan noted that Plaintiff had been diagnosed with traumatic brain injury (TBI).  (R. at 773-74.)

On September 12, 2008, Sherri L. Beaver, OTR, evaluated Plaintiff and found fine motor disturbance secondary to a constant tremor, impaired ocular pursuits, decreased visual motor speed of response, and impaired convergence.  (R. at 767-68.)  She diagnosed him with post-concussion syndrome.  (R. at 767.)

On November 3, 2008, Plaintiff had an MRI of his brain, which showed no evidence of intracranial pathology.  (R. at 2702-03.)  He reported impaired cognitive functions, tremors in his right upper extremity, back and knee pain, and migraine headaches.  (R. at 3814.)

On January 13, 2009, Plaintiff was examined by Victor Neufeld, Ph.D., to assist with a disability determination.  (R. at 530-34.)  Dr. Neufeld also reviewed Plaintiff's records from Fort Carson, which reflected a history of post-traumatic stress disorder (PTSD) and brain injury with

3

"conversion features." (R. at 530.) Plaintiff reported photophobia, daily migraines treated with Imitrex injections, and decreased memory. (*Id.*) Dr. Neufeld noted cognitive slowing, a history of adolescent anger management problems, and adolescent therapy, but that Plaintiff's brain CT and MRI were "unremarkable." (*Id.*) He concluded that Plaintiff's "primary obstacles to working and general function lie in the realm of emotional distress rather than cognitive impairment." (R. at 534.) Dr. Neufeld opined that Plaintiff was likely to be at least moderately impaired socially and with respect to persistence and pace, and he recommended continued psychiatric care, including psychotherapy. (*Id.*)

On February 10, 2009, Plaintiff was admitted to the emergency room with back pain and weakness in his legs. (R. at 789.) He reported continued pain after his fall, but was "doing well" with a chiropractor until a few weeks before his admission. (*Id.*) "After a chiropractic session, he had increased pain and felt like his legs were weak." (*Id.*) An MRI and CT scan of Plaintiff showed small tears in the annulus, but neither cord nor nerve root compressions. (*Id.*) Plaintiff experienced increased pain and weakness and difficulty with urinary retention and constipation, and a second MRI exam was conducted. (*Id.*) Plaintiff was discharged on February 12, 2009, with a diagnosis of acute low back strain with lumbar disk disease, history of chronic low back pain, history of anxiety, history of depression and prior suicidal ideation, history of PTSD, history of cognitive disorder with adjustment difficulties and conduct disturbance in the past, cervical degenerative disk disease, chronic migraines, and insomnia and post-concussive syndrome. (R. at 789-90.)

Plaintiff was admitted to an inpatient treatment facility July 15, 2009, with major depression and recurrent PTSD. (R. at 802.) He cooperated with the treatment program, quickly stabilized, and was discharged on July 17, 2009. (R. at 807-08.) Plaintiff attended counseling intermittently after

his discharge.  (*See* R. at 828-33, 1583-86.)

Benjamin Loveridge, M.D., conducted a physical medical consultation on December 5, 2009. (R. at 1594-1600.)  He found that Plaintiff's TBI resulted in impaired cognitive ability, tremors, memory problems, and back problems, and he recommended continued cognitive rehabilitation.  (R. at 1599.)

On December 11, 2009, R. Terry Jones, M.D., conducted a medical consultation.  (R. at 1797-1802.)  He found mild to moderate PTSD, which he characterized as "some hypervigilance, exaggerated startle response, occasional difficulty with irritability and increased anger outbursts and some avoidance of situations that are crowded with people."  (R. at 1800.)  He also found Plaintiff's memory was slow, that he had "difficulty" recalling three words after five minutes," and had a GAF in the 55-60 range.  (R. at 1800-02.)

After his discharge from the army on July 26, 2010, (R. at 3814), Plaintiff was seen by Samuel Mathai, M.D. (R. at 3102-10, 3948-49, 4375-78.)  Dr. Mathai met with and evaluated Plaintiff at least once every two to three months to treat his symptoms and adjust his medication as needed.  (R. at 3102-10, 3287-88, 3333-34, 3358-59, 3455-56, 3948-49, 3990-91, 3994-95, 4027, 4048.)  During his sessions with Plaintiff, he recorded persistent symptoms, including anger, irritability, avoidance of crowds, noise, and people as well as "daily or more" trauma-related memories or nightmare.  (R. at 3359, 3948, 3988.)

On October 13, 2010, Plaintiff had a consultative examination with Kirsi Waller, Ph.D.  (R. at 3010-18.)  Dr. Waller noted that he drove himself to the evaluation and was properly dressed with good hygiene and grooming.  (R. at 3010.)  Dr. Waller found that Plaintiff had significant impairment in function due to TBI, chronic pain, and associated physical limitations as well as

emotional dysfunction. (R. at 3018.) He also found Plaintiff continued to have marked symptoms of PTSD, significant memory impairment and other cognitive deficits secondary to his head injury, and that his declined cognition caused problems in his everyday life due to forgetfulness and disorientation. (*Id.*) Dr. Waller opined that Plaintiff was "not employable at the present time due to functional impairment as well as marked emotional dysfunction." (*Id.*)

On November 10, 2010, State Agency Medical Consultant (SAMC) Henry Hanna, Ph.D., completed a Psychiatric Review Technique for Plaintiff, and found mild restriction of activities of daily living and moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace. (R. at 3020-32). In considering Plaintiff's anxiety-related disorders, he noted that Plaintiff self-report could not be considered reliable because some consultative findings were "at odds with all other objective findings." (R. at 3025.)

That same day, Dr. Hanna also completed a Mental RFC Assessment for Plaintiff. (R. at 3034-36.) He found that Plaintiff was markedly limited in his ability to understand and remember detailed instructions and to carry out detailed instructions. (R. at 3034-35.) He also found that Plaintiff was moderately limited in his ability to: maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and get along with coworkers or peers without distracting them or exhibiting behavior extremes. (*Id.*) He opined that Plaintiff could understand, remember, and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with coworkers and supervisors, and respond appropriately to changes in a routine work setting. (R. at 3036.)

On March 5, 2012, the VA found Plaintiff to be 100 percent disabled.  (R. at 3666-72.)  The VA noted that 70 percent of the disability rating was due to PTSD, which reflected an "occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood."  (R. at 3667-68.)

On October 29, 2013, Dr. Mathai completed a Mental RFC Assessment for Plaintiff for July 28, 2010 through October 2013.  (R. at 4046-49.)  He found that Plaintiff was markedly limited in all areas, except that he was only moderately limited in his ability to remember locations and work-like procedures, understand and remember very short and simple instructions, and carry out very short and simple instructions.  (R. at 4046-47.)  He opined that Plaintiff was limited in multiple function categories and was "unemployable."  (R. at 4048.)

On November 6, 2013, Plaintiff had a clinical interview with Linda Cameron, Ph.D., who conducted various tests.[3]  (R. at 4050-79.)  She noted that "[i]n spite of taking [various] drugs to control his mental and emotional problems, his objective psychological testing still reveals significant psychological, mental, and emotional problems that compromise his ability to obtain and maintain employment. Therefore, it is concluded that [Plaintiff] cannot successful[ly] perform work in a competitive employment environment."  (R. at 4070.)

### 3.    January 20, 2012 Hearing Testimony

On January 20, 2012, Plaintiff, a vocational expert (VE), and Plaintiff's fiancée testified at a hearing before the ALJ.  (R. at 95-130.)  Plaintiff was not represented by an attorney.  (R. at 97.)

---

[3]  Dr. Cameron used the following assessment techniques: Millon Clinical Multiaxial Inventory, Burns Anxiety Checklist, Beck Depression Checklist, PTSD Checklist - Military Version, Dissociation Experiences Scale, and Owestry Activity Rating Scale.  (R. at 4051.)

### a.    *Plaintiff*

Plaintiff testified that he was married but separated from his second wife and engaged to another woman, and he had two children.  (R. at 105-06, 111.)  He shared custody of the children "as much as possible" and saw them on weekends.   (R. at 105-06.)  Plaintiff lived in a first floor apartment with his fiancée.  (R. at 111.)  He had a valid driver's license, but drove only when he had no choice, such as to attend classes.   (R. at 106.)

Plaintiff took classes at Tarrant County Community College (TCCC), including Theater Practicum, Scenic and Set Design, and English Comp II.  (R. at 102.)  He did not build sets, but worked on ticket sales, lighting, and stage management.  (R. at 102-03.)  He had taken fourteen credit hours the prior semester, and twelve credit hours per semester the year before. (R. at 104.)  He had previously failed several classes, including science, science lab, English, speech, and math.  (R. at 105.)  He retook some of the classes later, but did not say how he did.  (*See id.*)  He had to stop attending class mid-semester because he was unable to get out of bed.  (*Id.*)

Plaintiff did not want to be around people, and over the prior six months, he had become "more and more of a recluse."  (R. at 109.)  He did not like to leave his apartment alone because he would become "extremely agitated very quickly" and had a hard time retaining control.  (*Id.*)  He attributed his agitation to anxiety and being around people. (R. at 115.) Additionally, Plaintiff could only sit or stand for between 25 and 45 minutes before he needed to change positions.  (R. at 113.)  He attributed this limitation to torn and herniated discs, which caused pain down his left leg and the need for an assisted walking device.  (*Id.*)  Plaintiff also experienced migraine headaches, which lasted eight to 10 hours, three to four times a week.  (R. at 114.)  To treat the migraines, Plaintiff used Imitrex injections.  (*Id.*)  The treatment caused him to feel "foggy" the following day, however.

(*Id.*)  He also claimed to suffer from memory loss.  (R. at 119.)

Plaintiff wore prescription tinted indoor glasses as well as tinted sunglasses for outdoor use. (R. at 106-07.)  He used a cane around his apartment and for "short" distances, but also had a rolling walker with a seat, which he used at the hearing.  (R. at  107.)  Plaintiff previously attended physical therapy, but they only showed him how to use his walker.  (*See* R. at 108.)  He also received medication and EMDR therapy for his PTSD.  (R. at 108-09.)  Plaintiff took Wellbutrin, Paxil, Klonopin, and a fatty liver pill.  (R. at 112-13.)  He used neither prescription nor over-the-counter pain medication at the time of the hearing.   (R. at 111-12.)

In response to questions regarding sporting events and live concerts that Plaintiff attended, he attributed his ability to attend those events to being in a private boxes with other veterans or with his fiancée and on medication.  (*See* R. at 115-19.)  Plaintiff testified that he could go through areas with crowds of people as long as he did not have to stay with the crowd.  (R. at 116.)

### b.      *VE*

The ALJ asked the VE to consider a hypothetical person who was of the same age and vocational profile as Plaintiff.  (R. at 98.)  The hypothetical person possessed the ability to lift and carry 50 pounds occasionally and 25 pounds frequently, push and pull the weights given, stand and walk for six of eight hours, sit for six of eight hours, and finger occasionally.  (R. at 98-99.)  The ALJ then asked the VE whether the hypothetical person could perform any of Plaintiff's past work. (R. at 99.)  The VE responded that the hypothetical person could work as a security guard, but could not perform any of Plaintiff's other past work.  (*Id.*)

The ALJ then asked the VE to consider the same hypothetical person, but that he could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for six of eight hours;

sit for six of eight hours; occasionally climb ramps or stairs but never ladders, ropes, or scaffolds; and never balance. (R. at 99-100.) The hypothetical person could occasionally stoop, crouch, crawl or kneel, and finger. (R. at 100.) The ALJ asked whether the hypothetical person could perform any of Plaintiff's past work, and the VE opined that the person could be a security guard. (*Id.*)

The ALJ then asked the VE to assume the same hypothetical person but that he could lift and carry a maximum of 10 pounds; stand and walk for two of eight hours; sit for six of eight hours; occasionally climb ramps or stairs but never ladders, ropes, or scaffolds; and never balance. (*Id.*) He could also engage in occasional fingering. (*Id.*) The ALJ asked the VE whether the hypothetical person could engage in any of Plaintiff's past work, and the VE said he could not. (*Id.*) The VE further opined that the hypothetical person could work as a surveillance system monitor (379.367-010, sedentary, SVP: 2) with 88,000 jobs in the national economy and 3,000 in Texas; a callout operator (237.367-014, sedentary, SVP: 2) with 55,000 jobs in the national economy and 5,000 in Texas; and an account clerk (205.367-014, sedentary, SVP: 2) with 200,000 jobs in the national economy and 3,000 in Texas. (R. at 100-01.) Her answer would not change if the hypothetical person required a cane for ambulation. (R. at 101.) The VE also stated that her testimony was consistent with the Dictionary of Occupational Titles (DOT). (*Id.*)

### c.    *Plaintiff's Fiancée*

Plaintiff's fiancée testified that she was engaged to Plaintiff and was his caregiver. (R. at 123.) She had known him since they were in high school, and they had dated since 2009. (*Id.*) She and Plaintiff lived together in an apartment; they moved into it by themselves without hiring movers. (*Id.*) Plaintiff had "pushe[d] through the pain" and carried some of the boxes. (*Id.*)

She testified that Plaintiff had severe PTSD, issues with being outside of the apartment, was

almost agoraphobic, and had issues with people.  (R. at 124.)  He also had issues sitting or standing

for more than five to 10 minutes at a time because of his back.  (*Id.*)  When Plaintiff bent, his back

seized up and he could not get back up.  (R. at 125.)  He could, however, reach and grasp items as

long as he was not required to bend.  (R. at 126.)  He had trouble remembering "complicated

instructions," but "[i]f they're simple one or two sentence instructions . . . he's fine with it."  (R. at

124.)  He experienced migraines one to four times a week, was sensitive to light, and wore interior

glasses.  (*Id.*)  Additionally, Plaintiff was able to drive, but his back would hurt after approximately

30  minutes, so he would have to stretch or shift.  (R. at 125.)

Plaintiff did not exercise, but he would sometimes "try" to walk depending on how his back

felt that day.  (R. at 127.)  Plaintiff's fiancée helped him undress at night, including taking off his

shoes, pants, shirt, and socks.  (R. at 127-28.)  She occasionally had to help him shower.  (R. at 128.)

### 4.      February 26, 2014 Hearing Testimony

After the case was remanded from the Appeals Council, Plaintiff, a medical expert (ME), and

a VE testified at a hearing on February 26, 2014.  (R. at 43-94.)  Plaintiff was represented by an

attorney.  (R. at 45.)

#### a.      *Plaintiff*

Plaintiff testified that he lived in a one story house with his wife (his fiancée at the January

20, 2012 hearing).  (R. at 71-72.)  He had a driver's license and still drove at times, but he preferred

his wife to drive him.  (R. at 72.)  He drove a non-modified vehicle and used his arms and legs to

control the vehicle.  (R. at 73.)

Plaintiff's condition had gradually deteriorated from his prior hearing on January 20, 2012,

to the point where his problems were "very much a hindrance."  (R. at 66-67.)  Specifically, his

anxiety became "a lot worse" to the extent that he was "not comfortable" being in public areas with other people. (R. at 67.)  He no longer attended public events, such sporting events or concerts. (R. at 68-69.)  The last event he had attended was a Dallas Stars game at the end of 2013. (*Id.*)  Plaintiff quit school in January 2014, but had previously attended TCCC and the Golf Academy of America, where he worked on a line of golf clubs that could be used from a wheelchair. (R. at 70-71.)

Plaintiff was unable to exercise. (R. at 74.)  His right leg was still "usable," but "any type of use of [his] left leg [was] basically carrying around dead weight." (R. at 74-75.)  In response to questions about his limitations and his use of a wheelchair (since he used a rolling walker at his last hearing), Plaintiff testified that he over-exerted himself and he had an "extremely sharp" pain, which shot from a spot in his lower back through his cheek and down into the back of his leg to just past his knee. (*See* R. at 75-76, 79.)  He then experienced a "numbness and tingling" sensation in his lower back, down his leg, and into his left foot. (*See* R. at 75-79.)

### b.     ME

The ME testified that based on his review of the medical file, Plaintiff did not meet or medically equal a Social Security impairment listing. (R. at 47.)  There was no evidence of any neurologic deficits as it related to a pinched nerve or some kind of nerve damage or radiculopathy. (R. at 47-48.)  There was evidence of a mild impairment to Plaintiff's memory, both visual and auditory, but no evidence of dementia, so he did not meet a listing for cognitive impairment. (R. at 48.)  Plaintiff's tremor was treatable. (*Id.*)

The ME opined that Plaintiff could do light duty, but was limited to lifting 15 to 20 pounds occasionally and five to 10 pounds frequently. (R. at 48-49.)  Plaintiff should not be involved in unprotected heights, climb ladders or stools, and should not work with moving machinery. (R. at

12

49.)  Plaintiff could sit for six hours a day, and there was no limitation on walking or standing, but walking would "probably" be limited to one or two hours a day because of pain and medication.  (R. at 49-50.)  Based on the records, Plaintiff did not need a motorized wheelchair.  (R. at 54.)

      *c.*    **VE**

The VE testified that Plaintiff had past work as a security guard (372.667-034, light, SVP: 3), cavalry (378.367-030, very heavy, SVP: 4),[4] and cashier (211.462-010, light, SVP: 2).  (R. at 88.)

The ALJ asked the VE to assume a hypothetical person of Plaintiff's age, education, and work history.  (*Id.*)  The hypothetical person could lift and carry 20 pounds occasionally and 10 pounds frequently, walk for two out of six hours, and sit for six out of eight hours.  (R. at 88-89.)  The hypothetical person could also occasionally climb ramps or stairs, stoop, crouch, crawl, or kneel, but neither balance nor perform overhead reaching.  (R. at 89.)  He could not work near hazards or drive as a job duty, but he retained the ability to understand, remember, and carry out detailed, but not complex, instructions.  (*Id.*)  The ALJ then asked the VE whether the hypothetical person could perform any of Plaintiff's past work, and the VE said he could not.  (*Id.*)  The hypothetical person could work as a ticket taker (344.677-010, light, SVP: 2) with 25,080 jobs nationally and 1,920 in Texas, an information clerk (267.367-018, light, SVP: 2) with 45,500 jobs nationally and 2,260 in Texas, and a counter clerk (249.366-010, light, SVP: 2) with 82,500 jobs nationally and 1,700 in Texas.  (*Id.*)

The ALJ then asked the VE to also consider occasional contact with coworkers and supervisors but no public contact.  (*Id.*)  The VE opined that none of the jobs would remain given the added limitations, but that the hypothetical person could be an addresser (209.587-010,

---

[4]  The transcript mistakenly identifies this position as "Calvary."  (R. at 88.)  In her decision, the ALJ identified this position as "cavalry scout."  (R. at 32.)

sedentary, SVP: 2) with 24,050 jobs nationally and 1,200 in Texas, a final assembler (713.687-018, sedentary, SVP: 2) with 132,400 jobs nationally and 3,240 in Texas, and a routing clerk (222.687-022, light, SVP: 2) with 27,200 jobs nationally and 1,250 in Texas.  (R. at 89-90.)

The ALJ then added that the person was restricted to a sedentary exertional level, lifting and carrying a maximum of 10 pounds, and used a cane while walking. (R. at 90.)  The VE opined that sedentary positions would remain and that the hypothetical person could also be a surveillance system monitor (378.367-010, sedentary, SVP: 2) with 8,200 jobs nationally and 240 in Texas.  (*Id.*)

The VE testified that the tolerance for absences was one to two absences per month and that an employee could be off task a maximum of five minutes per hour above the scheduled break periods.  (*Id.*)  A person's inability to perform activities within a schedule, the inability to sustain an ordinary routine without special supervision, a markedly limited ability to make simple work-related decisions, and an inability to complete a normal work day and/or work week would preclude competitive employment.  (R. at 92.)  The VE testified that her testimony was consistent with the DOT and that any testimony not addressed by the DOT was based on her experience. (R. at 92-93.)

## C.    The ALJ's Findings

The ALJ issued her decision denying benefits on June 23, 2014.  (R. at 19-33.)  At step one,[5] she found that Plaintiff had not been engaged in substantial gainful activity during the period from his alleged onset date of May 1, 2008 through December 31, 2013, his date of last insured.  (R. at 22.)  At step two, she found that Plaintiff had the following severe impairments: degenerative disc disease, obesity, occasional tremors of right upper extremity and chronic pain disorder associated with the physical impairments, and mild PTSD.  (*Id.*)  At step three, the ALJ found that Plaintiff did

---

[5]  The five-step analysis used to determine whether a claimant is disabled under the Social Security Act is described below.

not have an impairment or combination of impairments that met or medically equaled the severity of the impairments listed in the regulations.  (R. at 22-26.)

Next, the ALJ determined that Plaintiff had the following Residual Functional Capacity (RFC): lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk for six hours in an eight-hour workday but walking was restricted to only two of the six hours, sit for six hours in an eight-hour workday, occasionally climb ramps or stairs, never climb ladders, ropes, or scaffolds, never balance, and occasionally stoop, crouch, crawl, and kneel. (R. at 26.)  Additionally no overhead reaching was permitted, and Plaintiff could not work around hazards, including unprotected heights, open flames, moving machinery parts, or drive as a job duty.  (*Id.*)  Plaintiff could understand, remember, and carry out detailed, but not complex, instructions.  (*Id.*)  At step four, the ALJ found that Plaintiff could not perform his past relevant work.  (R. at 32.)

The ALJ continued to step five and found that transferability of job skills was not material to the determination of disability because use of the Medical-Vocational Rules as a framework supported a finding that Plaintiff was not disabled.  (*Id.*)  Considering Plaintiff's age, education, work experience, and RFC, the ALJ found there were jobs in significant numbers in the national economy that he could perform.  (R. at 32-33.)  Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined under the Social Security Act, from May 1, 2008, the alleged onset date, through December 31, 2013, the date he was last insured.  (R. at 33.)

## II.   ANALYSIS

### A.   Legal Standards

#### 1.   Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the

Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *Id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *Id.* at 436 and n.1.

### 2.      Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295.  An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability."  *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be disabled.

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.    If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.    If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id.*  Once the claimant satisfies his or her burden under the first four steps, the

burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.    Issues for Review**[6]

Plaintiff raises five issues for review:

1.    The ALJ did not apply the proper legal standard and failed to support her decision that [Plaintiff's] mental impairments do not meet listing level severity with substantial evidence when she failed to give controlling or great weight to the opinion of [Plaintiff's] treating physician.

2.    The ALJ's decision to improperly discount treating and examining physicians' medical opinions as subjective also prejudices [Plaintiff].

3.    The ALJ applied improper legal standards when assessing [Plaintiff's] residual functional capacity and did not base her assessment on substantial evidence.

4.    The ALJ's failure to give great weight to the VA's 100 percent disability rating or to provide a valid reason for disregarding it constitutes reversible error.

5.    The ALJ similarly committed a prejudicial error when she disregarded the vocational expert's testimony that [Plaintiff's] PTSD, as described by his treating physician, would preclude competitive employment.

---

[6] The shorter version of Plaintiff's five issues that is used in the body of his brief is recited here, rather than the longer version set out in his statement of issues. (*See* doc. 17 at 8, 15, 21, 23, 29, 30.)

(doc. 17 at 15, 21, 23, 29, 30.)

**C.     Treating Physician**

In his first and second issues, Plaintiff contends that the ALJ erred by failing to give controlling weight to his treating physician's medical opinions in determining whether his mental impairments met listing level severity. (doc. 17 at 15, 21, 30.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. § 404.1529(b). Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. *Id.* § 404.1527(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id.* § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id.* § 404.1527(c)(2). If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* § 404.1527(c)(1)–(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating

physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).  If evidence supports a contrary conclusion, an opinion of any physician may be rejected.  *Id.*  A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 455-56.  Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453.  A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

Here, the ALJ identified the following severe impairments at step two: degenerative disc disease, obesity, occasional tremors of right upper extremity and chronic pain disorder associated with the physical impairments, and mild PTSD.  (R. at 22.)  At step three, she found that Plaintiff did not meet or medically equal Listings 12.04 or 12.06.  (*Id.*)  In making her decision, the ALJ expressly considered the medical opinions of Dr. Mathai, Plaintiff's treating physician.  (*See* R. at 22-26.)  She explained her concerns that his medical opinions were based on Plaintiff's own subjective reports of the level of collective symptoms he experienced, as opposed to an objective mental exam or observations by medical staff or other parties with no personal relationship with

Plaintiff.  (*Id.* at 23.)  The ALJ also contrasted Dr. Mathai's medical assessment with his own treatment notes and other objective medical evidence.  (R. at 24, 4374-80.)  Because the ALJ relied on competing first hand medical evidence when she rejected the medical opinions of Plaintiff's treating physician regarding severity, her decision was based on substantial evidence, and she was not required to conduct the analysis set forth in sections 404.1527 and 416.1927.[7]  *See Belk v. Colvin*, 648 F. App'x 452, 455 (5th Cir. 2016) (per curiam) ("Conflicts of evidence are for the Commissioner to resolve; in applying the substantial evidence standard, we do not reweigh the evidence, but merely determine whether the Commissioner's decision is supported by substantial evidence.") (citing *Perez*, 415 F.3d at 461); *see, e.g., Wells v. Colvin*, No. 3:15-CV-3759-BK, 2016 WL 4920289, at *4 (N.D. Tex. Sept. 15, 2016) (affirming the ALJ's decision because "the doctor's opinion on the checklist form was inconsistent with and unsupported by the other substantial evidence of record, including [her] own treatment notes").  Remand is therefore not required on this basis.

**D.**    **Listing 12.06**

Plaintiff contends that the ALJ erred when she determined that Plaintiff's impairments did not meet or equal Listing 12.06, relying in part on *Audler v. Astrue*, 501 F.3d 446 (5th Cir. 2007). (doc. 17 at 14-17, 21.)

If a claimant is not working and is found to have a severe impairment at step two that meets the duration requirement, the ALJ must determine at step three whether the claimant's impairment meets or medically equals one of the impairments listed in the regulations.[8]  *Compton v. Astrue*, No.

---

[7]  Because the ALJ relied on competing first hand medical evidence, it is unnecessary to consider the parties' arguments regarding Dr. Mathai's use of a check-the-box form.

[8]  These impairments are listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.

3:09-CV-051513-B-BH, 2009 WL 4884153, at *6 (N.D. Tex. Dec.16, 2009) (citing 20 C.F.R. § 404.1520). If the claimant's impairment meets or medically equals a listed impairment, the disability inquiry ends and the claimant is entitled to benefits. 20 C.F.R. § 404.1520(d). The claimant has the burden of proving that his impairment or a combination of impairments meets or medically equals one of the listings. *Id.*; *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990) (per curiam).

To meet a listed impairment, the claimant's medical findings, i.e., symptoms, signs, and laboratory findings, must match all those described in the listing for that impairment. 20 C.F.R. §§ 404.1525(d), 404.1528; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). To equal a listing, the claimant's unlisted impairment must be "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). The claimant shows that his unlisted impairment or a combination of impairments is "equivalent" to a listed impairment by presenting medical findings equal in severity to all the criteria for the most analogous listed impairment. *Sullivan*, 493 U.S. at 529-31; *see also* 20 C.F.R. § 404.1526(b)(2). The ALJ must consider all of the evidence that is relevant to the claimant's impairments and their effects on the claimant, but must not consider vocational factors such as age, education, and work experience. 20 C.F.R. § 416.926(c). "[T]he responsibility for deciding medical equivalence rests with the [ALJ]." *Id.* § 416.926(e).

In *Audler*, the Fifth Circuit held that the ALJ committed legal error when she "summarily concluded" that the claimant's impairments were not severe enough to meet or medically equal one of the listed impairments, but "did not identify the listed impairment for which [the claimant's] symptoms fail[ed] to qualify," and did not "provide any explanation as to how she reached the conclusion[.]" *Audler*, 501 F.3d at 448. Noting that an ALJ was not "always required to do an

exhaustive point-by-point discussion," the *Audler* court stated that it simply could not "tell whether her decision [was] based on substantial evidence" because she "offered nothing to support her conclusion at this step." *Id.* (internal quotation marks omitted) (quoting *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986)).

Applying *Audler*, courts have found that even when an ALJ specifically identifies a listing at step three, he or she errs by failing to discuss the medical evidence and provide the reasons for the step three determination because such failure prevented meaningful judicial review. *Woods v. Colvin*, No. 3:14-CV-1990-B-BH, 2015 WL 5311142, at *11 (N.D. Tex. Aug. 26, 2015), *adopted by* 2015 WL 5319926 (N.D. Tex. Sept. 10, 2015) (citing cases); *see, e.g., Jones v. Colvin*, No. H-13-1221, 2014 WL 3827819, at *9 (S.D. Tex. July 31, 2014) (concluding that the ALJ erred by failing to discuss evidence or provide reasoning for the step three determination); *Matthews v. Astrue*, No. 11-667-RLB, 2013 WL 5442265, at *4-5 (M.D. La. Sept. 27, 2013) (finding error where the ALJ specifically stated that she considered Listing 1.04A, but did not explain the basis for concluding that the claimant's sensory loss was due to an unrelated problem, and failed to discuss or mention any evidence relating to the remaining 1.04A criteria); *Inge ex rel. D.J.I. v. Astrue*, No. 7:09-CV-95-O, 2010 WL 2473835, at *9 (N.D. Tex. May 13, 2010) (finding that the ALJ erred by not specifically identifying the evidence he relied on for his conclusion at step three), *adopted by* 2010 WL 2473598 (N.D. Tex. June 16, 2010). "Although it is not always necessary that an ALJ provide an exhaustive discussion of the evidence, bare conclusions, without any explanation for the results reached, may make meaningful judicial review of the Commissioner's final decision impossible." *Inge ex rel. D.J.I.*, 2010 WL 2473835, at *9 (citing *Audler*, 501 F.3d at 448).

Here, the ALJ found that Plaintiff did not meet or medically equal Listings 12.04 or 12.06.

(R. at 22.)  As noted, the ALJ expressly considered the medical opinions of Plaintiff's treating physician but gave it "little weight" because of other first hand medical evidence.  (*See* R. at 22-26.) Additionally, she considered the opinions of Drs. Cameron and Hanna regarding severity and the listings, but also gave their opinions "little weight" because of their reliance on subjective information.  (R. at 23-24.)  Because the ALJ considered the medical evidence and explained her conclusions and determinations at step three, the ALJ did not commit legal error.  *Cf., Woods*, 2015 WL 5311142, at *12 ("The ALJ committed legal error when she failed to discuss *any* of the Plaintiff's medical evidence and explain how the evidence did not meet the severity criteria of Listing 1.04.") (emphasis added); *Grays v. Colvin*, No. 3:12-CV-00138-B, 2013 WL 1148584, at *11 (N.D. Tex. Mar. 19, 2013) ("The ALJ committed legal error at step three by failing to discuss *any* of Plaintiff's medical evidence, including the findings and opinions of his treating physicians, as the evidence related to the issue of whether Plaintiff's degenerative disc disease met the severity criteria of Listing 1.04A.") (emphasis added).  Remand is therefore not required on this basis.

E.    **RFC Assessment**

Plaintiff contends that the ALJ's RFC assessment was not supported by substantial evidence. (doc. 17 at 21, 23.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations.  20 C.F.R. § 404.1545(a)(1) (2003).  The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work."  *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988) (per curiam). The relevant policy interpretation regarding the RFC determination states:

1. Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

2. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms.

SSR 96–8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).

Determination of an individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1. Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. 20 C.F.R. § 404.1527(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id.* § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id.* § 404.1527(c)(2).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455. The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision, or all the evidence

25

that she rejected. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the [ALJ's] findings." *Id.* (citations omitted) Courts may not re-weigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the ALJ's decision. *See Johnson*, 864 F.2d at 343 (citations omitted).

Plaintiff first argues that the ALJ improperly relied on her own lay opinion to determine the effects of his mental impairments in violation of *Ripley v. Chater*, 67 F.3d 552 (5th Cir. 1995) (*See* doc. 17 at 24.)

In *Ripley*, the claimant argued that the ALJ failed to develop the record fully and fairly by finding that he could perform sedentary work even though there was no medical testimony to support that conclusion. *Ripley*, 67 F.3d at 557. The Fifth Circuit noted that although an ALJ should usually request a medical source statement describing the types of work that the applicant was still capable of performing," the absence of such a statement did not necessarily make the record incomplete. *Id.* Rather, the court had to consider whether there was substantial evidence in the record to support the ALJ's decision. *Id.* The record contained "a vast amount of medical evidence" establishing that the claimant had a back problem, but it did not clearly establish the effect of that

problem on his ability to work. *Id.* The ALJ's RFC determination was therefore not supported by substantial evidence, so the Fifth Circuit remanded the case with instructions to the ALJ to obtain a report from a treating physician. *Id.* at 557-58. Notably, the Fifth Circuit rejected the Commissioner's argument that the medical evidence discussing the extent of the claimant's impairment substantially supported the ALJ's RFC assessment, finding that it was unable to determine the effects of the claimant's condition on his ability to work absent reports from qualified medical experts. *Id.* at 558 n.27.

The Commissioner argues that the ALJ properly found that Plaintiff could understand, remember, and carry out detailed but not complex work because she noted Plaintiff's "high B" grade average in 2010, considered the results of Plaintiff's IQ and memory testing, considered Dr. Jones's diagnosis of mild to moderate PTSD in 2009, and discounted the Psychiatric Review Technique from Dr. Waller. (doc. 18 at 22.)

The ALJ does not explain from where she derived the mental limitations for Plaintiff, however. (*See* R. at 26-31.) For example, in finding that Plaintiff could understand, remember, and carry out detailed but not complex instructions, the ALJ explained:

> Overall, the claimant's combined activities that included attending college, parenting his teenage daughter, public speaking, spending hours standing in the wings backstage at more than one concert and only presenting for follow-up every three months suggest only mild PTSD symptoms that were not limiting to the degree that the claimant would be unable to perform detailed but non-complex tasks.

(R. at 31.) Additionally, although the ALJ briefly referred to SAMC Dr. Hanna's opinions at step three regarding the listing impairments and his Psychiatric Review Technique, she does not appear to address Dr. Hanna's mental RFC assessment that Plaintiff could understand, remember, and carry out only *simple* instructions and make *simple* decisions in determining the RFC (or elsewhere in her

decision).  (R. at 3036.)  Likewise, she does not appear to consider the opinions of Drs. Mathai and Cameron in determining the mental RFC either, although both doctors assessed Plaintiff's mental functioning shortly before the hearing.  (*See* R. at 26-31, 4046-48, 4050-79.)

The ALJ therefore appears to have relied on her own interpretation of Plaintiff's medical and other evidence.  (*See* R. at 26-31) (noting that "[r]ecent records from treatment show essentially normal mental status exams"); *see, e.g., Tyler v. Colvin*, No. 3:15-CV-3917-D, 2016 WL 7386207 (N.D. Tex. Dec. 20, 2016) (finding that an ALJ impermissibly relied on his own medical opinion to develop his RFC determination).  Accordingly, the ALJ erred.  *See Hawkins v. Comm'r of Soc. Sec. Admin*, No. 3:11-CV-2992-B, 2013 WL 1129816, at *19 (N.D. Tex. Mar. 11, 2013) ("Because the ALJ implicitly rejected [the doctor's] opinions, she relied on her own lay interpretation of Plaintiff's medical and other evidence to find that she could stand for six hours of an eight-hour workday."), *adopted by* 2013 WL 1131249 (N.D. Tex. Mar. 19, 2013); *Davis v. Astrue*, No. 1:11 CV-00267-SA-JMV, 2012 WL 6757440 (N.D. Miss. Nov.6, 2012) ("In formulating a claimant's RFC, the ALJ-a layperson-may not substitute his own judgment for that of a physician."), *adopted by* 2013 WL 28068 (N.D. Miss. Jan. 2, 2013); *see also Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003) (per curiam); *West v. Sullivan*, 751 F. Supp. 647, 648 (N.D. Tex. 1990).

Because "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party have been affected," Plaintiff must show he was prejudiced by the ALJ's failure to rely on medical opinion evidence in assessing his RFC.  *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam).  To establish prejudice, Plaintiff must show that the ALJ's failure to rely on a medical opinion as to the effects his impairments had on his ability to work casts doubt onto the existence of substantial evidence

supporting his disability determination.  *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) ("Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision.") (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)).  The ALJ's failure to rely on a medical opinion in determining Plaintiff's RFC casts doubt as to whether substantial evidence exists to support the ALJ's finding that Plaintiff is not disabled.  *See, e.g., Laws v. Colvin*, No. 3:14-CV-3683-B, 2016 WL 1170826 (N.D. Tex. Mar. 25, 2016) (reversing and remanding for further proceedings for lack of substantial evidence because the ALJ's failure to rely on a medial opinion in determining the plaintiff's RFC); *see Williams v. Astrue*, 355 F. App'x 828, 832 (5th Cir. 2009) (per curiam) (finding the decision denying the claimant's claim was not supported by substantial evidence where the RFC was not supported by substantial evidence because the ALJ rejected the opinions of the claimant's treating physicians and relied on his own medical opinions as to the limitations presented by the claimant's back problems in determining the RFC).[9]

### III.  RECOMMENDATION

The Commissioner's decision should be **REVERSED**, and the case should be **REMANDED** for further administrative proceedings.

**SO RECOMMENDED** this 6th day of March, 2017.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[9]  Because remand is recommended based on the ALJ's lay opinion issue, and determination of Plaintiff's RFC on remand will likely affect the remaining issues, they will not be addressed here.

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE